UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Shawn Brye, | No. 2:23-cv-00343-KJM-CSK |
| Plaintiff, | ORDER |
| v. | |
| City of Stockton, et al., | |
| Defendants. | |

Shawn Brye alleges officers of the Stockton Police Department arrested him for trespassing without probable cause, used excessive force to arrest him, and then searched his car without a warrant, all in violation of the Fourth Amendment. The officers move for summary judgment. As explained in this order, Brye could not prove the officers used excessive force or lacked probable cause to make an arrest, and they would be entitled to qualified immunity even if he could. Finally, although the officers have not demonstrated on the record before the court that they had probable cause to search Brye's car, the law at the time was not clearly established, so the officers are entitled to qualified immunity in the face of that claim as well. The court therefore **grants** the motion.

I. BACKGROUND

There is for the most part no dispute about the incident that spurred this lawsuit. When the evidence does conflict, the court has viewed that evidence in the light most favorable to Brye,

1

1  the non-moving party, as required by Rule 56.  *See* Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus.*
2  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).
3           The events in this case took place in West Lane Plaza, a small shopping area in Stockton,
4  California, where several businesses share a common parking lot and sidewalk.  *See* Def. Exs. V–
5  GG (videos depicting shopping area).  In 2021, Manjinder Sahota, the owner of a liquor store in
6  the shopping area, had become frustrated with a persistent loitering problem.  *See* Sahota Dep. at
7  9–12, Def. Ex. S, ECF No. 52.  Day after day, people would gather on the shared sidewalk and in
8  the parking lot outside his store, where they would use and sell drugs and harass Sahota and his
9  customers.  *See id.* at 14–16, 29.  Some customers also saw the people in the group carrying guns,
10 *see id.* at 15, and there were reports of a shooting in the parking lot, *see id.* at 11.  Sahota felt
11 unsafe, and he spoke with the property manager, Michael Guindon, about the problem.  *See id.* at
12 9, 32; Guindon Dep. at 9, 15–18, Def. Ex. U, ECF No. 52.
13          On February 15, 2021, the property manager gave the Stockton Police Department a
14 "Trespassing Enforcement Letter."  Def. Ex. P, ECF No. 52.  "I have not granted permission to
15 anyone to congregate on the business premises," the letter said.  *Id.*  "Anyone on the property
16 (front yard, driveway, curtilage, back yard) is trespassing per the California Penal Code, section
17 602(m) and (n)."  *Id.*  Section 602(m) provides that "[e]ntering and occupying real property . . .
18 without the consent of the owner, the owner's agent, or the person in lawful possession" is a
19 misdemeanor.  Section 602(n) similarly makes it a misdemeanor to drive "a vehicle . . . upon real
20 property . . . known not to be open to the general public, without the consent of the owner, the
21 owner's agent, or the person in lawful possession."  Guindon intended for this letter to give the
22 Stockton Police Department authority to remove the people who were gathering in the common
23 areas at West Lane Plaza, including the people who were harassing Sahota and his customers, for
24 the next thirty days.  *See* Guindon Dep. at 16–17.
25          After Guindon provided this letter, the Stockton Police Department began to receive
26 calls—many calls, even five to ten a day—asking for officers to come remove people from the
27 West Lane Plaza common parking lot and sidewalks.  Howes Dep. at 14, Def. Ex. R, ECF No. 52.
28 Sahota made some of these calls.  *See* Sahota Dep. at 30–31.  He asked the Police Department to

keep his reports and requests anonymous, as he worried the loiterers would retaliate if they found out he had asked for them to be removed. *See id.* at 32. Officers came several times, each time dispersing the people who had gathered outside Sahota's store, but the repeated dispersals did not solve the problem: when the police arrived, the loiterers would run into nearby businesses, where they would stay until the officers left, then return to where they had been before the police arrived. *See id.* at 10–12, 14–16, 19–20, 30–31. They often ducked into a nearby laundromat, where they would pretend to be washing clothes while they waited for the officers to leave. *See id.* (explaining this sequence, describing how people would "go to the Laundromat parking lot acting like they're washing clothes," but only "just long enough for the police department to pull through").

Brye was one of the people who spent time in front of Sahota's store. *See id.* at 19–20, 32. Sahota remembers seeing him outside his store several times a week, almost every day. *See id.* at 32. Brye denies he was in front of Sahota's store exactly as often or as long as Sahota remembers, but he does not dispute that he regularly spent time there. *See* Brye Decl. ¶ 23, ECF No. 53-3.

Brye's legal claims relate to two calls for trespassing Sahota made in February 2021, a few days after Guindon gave the trespassing enforcement letter to police. Sahota called the police on the twenty-second of that month to report people had again gathered in front of his store, and he asked for officers to come remove them. *See* T. Inn Dep. at 18–19, Def. Ex. T, ECF No. 52; Howes Decl. at 1–2, ECF No. 51-5. Officers Tela Inn and Tiffany Howes were among those who responded. T. Inn Dep. at 19–22, 34–35; Howes Decl. at 1–2; Howes Dep. at 8–9. They knew about the letter from the property manager, and as they understood it, the property manager had given them authority to remove trespassers from the common areas. Howes Dep. at 10–11. When the officers arrived, they found Brye in the common area. T. Inn. Dep. at 22. As the officers approached him, he went into the laundromat, and he refused to leave when the officers spoke to him. Howes Decl. at 2. They arrested and cited him for trespassing. Brye Dep. at 22, Def. Ex. Q, ECF No. 52; Howes Dep. at 34, 46. They also told him they were acting at the request of the property manager, they told him he was not welcome, they warned him he was

3

1    trespassing, and they said he should not return.  *See* Brye Dep. at 26; T. Inn Dep. at 43; Howes
2    Decl. at 3.  Brye said he would be back the next day.  Howes Decl. at 2.  The officers warned him
3    they would arrest him again if he did come back, and not just the next day, but any day for the
4    next thirty days.  *Id.*  The officers' body cameras recorded these events.  *See* Def. Exs. V, W, X,
5    Y, Z, AA, BB (digital video files).  Brye does not disagree about what occurred or was said on
6    this day.  *See* Resp. Stmt. Facts Nos. 15–22.  After the officers spoke to him, they took him to the
7    Stockton Police Department, issued him a citation, and released him.  Howes Decl. at 2.

8    Brye came back to the shopping area the next day, as he said he would, and he parked his
9    car in the shared lot.  *See* Brye Dep. at 33–35.  Within fifteen or twenty minutes, police officers
10    again arrived, *id.* at 34, this time after hearing people were "loitering out of a vehicle with the
11    intent to sell narcotics" in the common area.  Brown Decl. at 2, ECF No. 51-3.  Officer Anthony
12    Brown was among the officers who responded.  *Id.*  He watched Brye walk from the parking lot
13    into the laundromat.  *Id.*  When Brown confronted Brye inside the laundromat and told him to
14    leave, Brye again refused.  *Id.*  Brown then tried to take Brye's arm and put him in handcuffs, but
15    Brye pulled away.  *Id.*  Three other officers then moved in.  *Id.*

16    The officers' body cameras and a bystander recorded video of the ensuing struggle.  *See,*
17    *e.g.*, Def. Exs. CC, DD (body camera video); Def. Ex. EE (bystander video).  The videos show
18    how the officers first took Brye's arms in their hands, which he tried to hold together in front of
19    his body, ignoring the officers' instructions to relax and not to fight.  *See, e.g.*, Ex. DD at 0:50–
20    1:05.  As the officers then separated his arms, he began pulling away from them.  *See, e.g.*, Ex.
21    EE at 0:00–0:05.  His footing was unsteady, and the officers pushed and pulled him to the ground.
22    *See id.* at 0:05–0:10.  Brye argues one of the officers tripped him.  The court's careful review of
23    the video evidence leads it to the conclusion the evidence does not support that argument, but
24    Brye could rely on the video and other evidence to prove the officers took him to the ground
25    using intentional, physical force that was equivalent to tripping him.  For this reason, the court
26    finds the dispute about whether they tripped him is not material.

27    When Brye fell, he hit his head on a bench.  *See id.* at 0:10–0:15; Brown Decl. at 2.  The
28    impact drew blood from the injury to the top of Brye's head.  *See* Def. Ex. O.  Brye did not lose

4

1    consciousness, nor does he offer evidence of any long-term injuries or permanent harm.  *See* Brye
2    Decl. ¶ 14 (describing injuries).  After the officers took him to the ground, they held him there by
3    putting weight on his legs and a hand on the back of his neck.  *See* Brye Decl. ¶¶ 15–17.  They
4    fastened his wrists in handcuffs, searched his pockets, gave him first aid, and called an
5    ambulance.  *See* Brye Dep. at 42–43; Brown Decl. at 2.  Nine medical "staples" were necessary to
6    close his head wound.  Brye Decl. ¶ 14.

7       After the officers arrested Brye, Sergeant Matthew Thurlow looked into the window of
8    Brye's car, which was still parked in the shared lot at the shopping area.  *See* Thurlow Dep. at 38,
9    Def. Ex. HH, ECF No. 52.  Officer Thurlow saw what he believed to be unburned marijuana.  *See*
10   *id.*  Brye does not dispute there was marijuana in his car.  He describes what Thurlow saw as
11   unburned "crumbs" of marijuana strewn about the front center arm rest.  Brye Decl. ¶ 21.
12   Thurlow understood local business owners had previously complained about Brye selling drugs
13   from his car, so after a discussion with the other officers, Thurlow decided there was probable
14   cause for a warrantless search.  *See* Thurlow Dep. at 38–39.  The officers searched the car and
15   found a scale, plastic baggies, and marijuana in glass jars, including one jar that appeared to have
16   been hidden inside a stuffed animal.  *See* Brown Decl. at 2; Brye Dep. at 54–55; Def. Ex. G, H, I,
17   ECF No. 52.

18      Brye admits the marijuana, the scale, and the baggies were his.  He also admits he had
19   been smoking marijuana about thirty minutes before his arrest, *see* Brye Dep. at 39, 52–53, as
20   well as drinking cognac from the bottle that was mostly empty when the officers took it from his
21   pocket, *see id.* at 39; Def. Ex. F.  Although Brye had been smoking and drinking, the officers do
22   not now claim to have believed at the time Brye was under the influence of drugs or alcohol.

23      The district attorney's office elected not to pursue charges against Brye.  *See* Goff Decl.
24   Ex. B, ECF No. 53-5.  A "complaint rejection notice" in the record has a checkmark next to a line
25   for "Inadmissible evidence/seizure," followed by a handwritten explanatory note: "No court
26   restraining order on suspect to justify arrest.  No warrant or probable cause to search duffel bag.
27   (Unburnt MJ in plain sight not sufficient.)"  *Id.*

Brye filed this case in February 2023. *See generally* Compl. ECF No. 1. His operative complaint, the Second Amended Complaint, includes four claims, all under 42 U.S.C. § 1983. First, he alleges the officers used excessive force in violation of the Fourth Amendment. *See* Second Am. Compl. ¶¶ 25–32, ECF No. 34. Second, he alleges the officers did not have authority to arrest him under the terms of the Fourth Amendment, *id.* ¶¶ 33–43, and he alleges Thurlow is liable because he was the other officers' supervisor, because he directed them on the scene, and because he did not intervene to stop the arrest, *see id.* ¶¶ 44–52. Third, Brye alleges the officers violated the Fourth Amendment by searching his car without a warrant, *see id.* ¶¶ 53–56, and he again alleges Thurlow is liable because he directed the search and did not intervene to stop it, *see id.* ¶¶ 57–65. Fourth, he alleges Howes fabricated evidence by writing a false report after the arrest. *See id.* ¶¶ 66–69. Finally, in addition to his claims against the individual officers, Brye alleges the City of Stockton is liable because its training and supervision fell short of what the Constitution requires. *See id.* ¶¶ 70–72.

As stated in the introduction, the case is before the court on defendants' motion for summary judgment. *See generally* Mot., ECF No. 51; Mem., ECF No. 51-1. The court took the motion under submission after receiving full briefing and a hearing on October 17, 2025. *See generally* Opp'n, ECF No. 53; Reply, ECF No. 57; Minutes, ECF No. 63. Stanley Goff appeared for Brye, and Mark Berry appeared for the defense.

**II.   DISCUSSION**

Brye has withdrawn his claims against the City, and he has withdrawn his claims against Thurlow with respect to the arrest on February 23, 2021, but not with respect to the search. *See* Opp'n at 15. Brye also has withdrawn his claim of fabricated evidence. *See id.* The court therefore dismisses these claims as withdrawn. In addition, Brye does not dispute that one of the defendant officers, Howes, was not on the scene of the disputed arrest and search. The court therefore grants the motion for summary judgment of the claims against Howes. Finally, defendant Jimmy Inn is deceased, and no substitution was made under Rule 25(a). The court therefore also grants the motion for summary judgment of the claims against him as well. Three

1  claims remain, each against Brown and Tela Inn: excessive force, unlawful arrest and unlawful
2  search.
3      For these claims, summary judgment is appropriate only if "there is no genuine dispute as
4  to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
5  56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving
6  party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it
7  "might affect the outcome of the suit under the governing law." *Id.* The parties must cite
8  "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The court then views the
9  record in the light most favorable to the nonmoving party and draws reasonable inferences in that
10 party's favor. *Matsushita*, 475 U.S. at 587–88; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157
11 (1970).

12     **A.    Claim 1: Excessive Force**

13     Brye first claims the officers used excessive force. The Fourth Amendment prohibits
14 officers from using excessive force to restrain a suspect. *See Torres v. Madrid*, 592 U.S. 306,
15 317–18 (2021). When a plaintiff alleges an officer's actions violated that prohibition, "the critical
16 question is whether the use of force was objectively reasonable." *Est. of Hernandez by & through*
17 *Hernandez v. City of Los Angeles*, 139 F.4th 790, 798 (9th Cir. 2025) (en banc). "Courts must
18 carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment
19 interests' against 'the countervailing governmental interests at stake,' considering 'the totality of
20 the circumstances.'" *Id.* (first quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989), then
21 quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)). "The relevant considerations depend on
22 the 'particular situation' and the 'particular type of force' used, and may include 'the severity of
23 the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or
24 others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.*
25 (first quoting *Scott v. Harris*, 550 U.S. 372, 382 (2007), then quoting *Kisela v. Hughes*, 584 U.S.
26 100, 103 (2018) (per curiam)). This question—whether the officers used reasonable or excessive
27 force—is independent from probable cause and whether the officers could make an arrest in the
28 first place. *See Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004). For that reason,

7

the court sets aside the parties' dispute about the officers' legal authority and instead focuses first on the reasonableness of the officers' actions.

Brye could not prove the officers used excessive force when they arrested him. There is no question about what happened when the officers confronted him in the laundromat. The confrontation was recorded by at least three cameras, and those recordings depict the incident clearly. As in *Scott v. Harris*, "[t]here are no allegations or indications that [the video] was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *See Scott*, 550 U.S. at 378. In the terms of Rule 56(a), there is no genuine dispute of any material fact. This does not mean that in every instance in which there is video a case can be resolved by a judge on summary judgment. "The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018). But if, as in this case, the video is clear and undisputed, and the entirety of the incident is depicted, a court can determine whether a reasonable factfinder could reach the conclusion urged by the party opposing summary judgment. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Although the officers did not suspect Brye of having committed any violent or dangerous crime, and although they do not argue they were justified in using force because he was drunk, high or dangerous, there is no dispute but that Brye's actions justified the officers' use of some type of physical response. Brye knew he was not welcome in the shopping area, both from his discussion with the officers the day before and the officers' statement just before they took hold of him, but he refused to leave, he ignored the officers' repeated verbal warnings and instructions, and he pulled and struggled against them as they attempted to place him in handcuffs. The force the officers used was proportional to his resistance at each step: they began with a verbal instruction, but he refused; they told him to relax and not to fight, but he ignored them and continued struggling against them; they attempted to restrain him in handcuffs, but he held his

1    arms in front of his body and prevented it; they surrounded him and attempted to pull his arms
2    apart, but he twisted and pulled himself away from them.  The officers then brought him to the
3    ground in a scrum, which, as noted, was as forceful and intentional an effort as tripping him
4    would have been, even though the video does not show they tripped him.  The video would not
5    permit Brye to prove at trial that the officers used more force than this, e.g., such as that they
6    slammed him down or threw him to the ground.

7    Perhaps with hindsight it could be argued the officers should have been more careful or
8    should have attempted to defuse the situation differently.  They found themselves in rather tight
9    quarters in the laundromat between hard metal machines, benches, and doors.  But the Supreme
10   Court repeatedly has instructed lower courts not to judge officers' actions "with the 20/20 vision
11   of hindsight."  *Graham*, 490 U.S. at 396.  "Not every push or shove" is excessive, the Court has
12   written, "even if it may later seem unnecessary in the peace of a judge's chambers."  *Id.* (quoting
13   *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  Only by disregarding that binding
14   directive could this court find the officers used excessive force in this case.

15   The force the officers used to subdue Brye was, for these reasons, within the boundaries of
16   what the Constitution permits.  Even if it were not, the officers would be entitled to qualified
17   immunity.  "Qualified immunity attaches when an official's conduct does not violate clearly
18   established statutory or constitutional rights of which a reasonable person would have known."
19   *Kisela*, 584 U.S. at 104 (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)).  "[T]he
20   focus is on whether the officer[s] had fair notice that [their] conduct was unlawful."  *Id.* (quoting
21   *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).  Brye cites no case that could have
22   given the officers that "fair notice," no case that clearly established the law.  He relies on
23   *Tennessee v. Garner* and *Graham v. Connor* and reiterates the general rules the Supreme Court
24   described in those cases, summarized above.  *See* Opp'n at 14–15 (citing 471 U.S. 1, 7–8 (1985)
25   and 490 U.S. at 396).  A plaintiff cannot rely on such general propositions to refute an officer's
26   assertion of qualified immunity because a district court must not define "clearly established law at
27   a high level of generality."  *Kisela*, 584 U.S. at 104 (quoting *City & County of San Francisco v.*
28   *Sheehan*, 575 U.S. 600, 613 (2015)).  "[The] inquiry 'must be undertaken in light of the specific

9

context of the case, not as a broad general proposition.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–6 (2021) (quoting *Brosseau*, 543 U.S. at 198).

The court's own searches have returned no case standing for the proposition at the time here that the officers used unconstitutionally excessive force, and in the absence of such authority, the officers could not have been fairly warned about any pertinent law. To the contrary, courts have long decided that officers may take a struggling suspect to the ground if their warnings and instructions go unheeded, even if they do not suspect any violent crimes or fear any significant dangers, including in cases of suspected trespasses, like this one. *See, e.g.*, *Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921–22 (9th Cir. 2001); *Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir. 1994); *Annan-Yartey v. Honolulu Police Dep't*, No. 06-00166, 2007 WL 2238858, at *5 (D. Haw. July 31, 2007), *aff'd*, 351 F. App'x 243 (9th Cir. 2009) (unpublished). By contrast, courts generally have found uses of force excessive only when the evidence could show the officers went far beyond what was necessary to overcome the suspect's resistance, such as by punching a suspect they had already wrestled to the ground and restrained. *See, e.g.*, *Blankenhorn v. City of Orange*, 485 F.3d 463, 470, 480 (9th Cir. 2007). Brye has not cited or pointed to evidence that shows this kind of altercation unfolded in this case. The court thus grants defendants' motion for summary judgment of Brye's first claim of excessive force.

**B.     Claim 2: Unlawful Arrest**

Brye next claims he was arrested unlawfully in violation of the Fourth Amendment. If officers arrest a person in a public place for a crime that person committed in the officers' presence, the arrest violates the Fourth Amendment if it was not "supported by probable cause." *Id.* at 470–71. Officers have probable cause if, at the moment of the arrest, they have "reasonably trustworthy information" about "facts and circumstances" that would suffice to permit a "prudent person" to believe the suspect "had committed or was committing an offense." *Id.* at 471 (alteration omitted) (quoting *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005)).

Like the excessive force standard, the probable cause standard is an objective one. *Edgerly v. City & County of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010). For that reason,

1    "probable cause supports an arrest so long as the arresting officers had probable cause to arrest
2    the suspect for any criminal offense," regardless of what reason the officers actually offered. *Id.*
3    But there must be probable cause under "some specific criminal statute." *Id.* And officers "must
4    have probable cause for specific intent when it is a required element." *Id.* at 953.

5          The officers in this case argue they had probable cause to conclude Brye was trespassing
6    in violation of the California Penal Code. The California Penal Code punishes a variety of
7    trespasses. For example, as the officers point out, section 602(m) prohibits "[e]ntering and
8    occupying real property or structures of any kind without the consent of the owner, the owner's
9    agent, or the person in lawful possession." Mem. at 11 (quoting Cal. Pen. Code § 602(m)). But a
10   reasonable officer could not have had probable cause to believe Brye ran afoul of this prohibition.
11   California courts have interpreted it as punishing only "a 'nontransient, continuous type of
12   possession.'" *Edgerly*, 599 F.3d at 954 (quoting *In re Catalano*, 29 Cal. 3d 1, 10 n.8 (1981)).
13   That is, section 602(m) requires the specific intent "to remain permanently, or until ousted." *Id.*
14   (quoting *People v. Wilkinson*, 248 Cal. App. 2d Supp. 906, 908 (1967)); *see also* Judicial Council
15   of Cal., Cal. Crim. Jury Instr. No. 2931 (2024) (defining elements). The record does not include
16   evidence that could show Brye intended to "remain permanently" in the laundromat or in the
17   common areas outside it, or that he intended to stay there until he was "ousted."

18         The officers also cite subdivision (k) of section 602. *See* Mem. at 12. That subdivision
19   punishes those who enter "lands, whether unenclosed or enclosed by fence, for the purpose of
20   injuring property or property rights or with the intention of interfering with, obstructing, or
21   injuring a lawful business or occupation carried on by the owner of the land, the owner's agent, or
22   the person in lawful possession." Cal. Pen. Code § 602(k). All agree Brye entered the common
23   area at West Lane Plaza. No one says this area was not "land" within the meaning of subdivision
24   (k). The probable cause question thus boils down to this: could a prudent person in the officers'
25   position have believed Brye came to the shopping area to injure property or property rights or to
26   interfere with, obstruct or injure a lawful business?

27         The Penal Code does not define the phrases "injury to property or property rights" and
28   "interfering with, obstructing, or injuring any lawful business." *See Blankenhorn*, 485 F.3d at

11

474.  In the absence of an express statutory definition, California courts have interpreted these phrases according to their "general usage" in criminal law. *Id.* (quoting *People v. Harris*, 191 Cal. App. 2d 754, 758 n.4 (1961)).  In general usage, the word "interfere" has a "well recognized, defined meaning." *Id.* (quoting *People v. Agnello*, 259 Cal. App. 2d 785, 791 (1968)).  It means "to disarrange, disturb, or hinder." *Id.* (citation and quotation marks omitted).  And in the context of property law and property rights, federal and state courts alike have said property owners and tenants have the "power" or "right" to "exclude" others from their property. *E.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982); *Allred v. Harris*, 14 Cal. App. 4th 1386, 1390 (1993).  In California, this right "is a fundamental aspect of private property ownership." *Allred*, 14 Cal. App. 4th at 1390.  People therefore may be acting with the specific intent required by section 602(k) if they know an owner or the owner's agent has excluded them or denied them permission to enter, but they enter the property anyway and refuse to leave.

In one case, for example, a man asked Disneyland for permission to set up a table, pass out flyers and collect signatures for an antipollution initiative in the Disneyland parking lot. *See In re Ball*, 23 Cal. App. 3d 380, 385 (1972).  The park refused. *See id.*  Despite that refusal, the man came to the parking lot and set up his table under a monorail track next to a ticket booth a few days later. *See id.*  The park was forced to divert its tram, and it asked him to leave, but he refused, at least until police officers arrived and issued him a citation. *See id.* at 385–86.  The man later was convicted of violating section 602(k),[1] and his conviction withstood his collateral attack. *See id.* at 382–83, 386–87.

In another case that bears a striking resemblance to this one, a security guard banned a man from a shopping mall, gave him a written notice of the ban, and asked him to leave. *Blankenhorn*, 485 F.3d at 467–68.  He came back a month later, and was detained and arrested for trespassing. *See id.* at 468–69.  After no charges were filed, he pursued claims under § 1983 in federal district court, alleging his arrest was unlawful. *See id.* at 467.  The district court granted the officers' summary judgment motion, and the Ninth Circuit affirmed: the officers had probable

---

[1] At the time the language in question was found in subdivision (j).

cause to believe the plaintiff had violated section 602(k) even though "an actual conviction for trespass might have been difficult without additional evidence." *Id.* at 472–74.

These cases show a prudent person in the officers' situation in this case could reasonably have believed Brye was violating section 602(k). The officers knew people were regularly gathering outside the liquor store and laundromat. They knew the liquor store's owner had complained of disturbances to his business, to his customers and to himself. They knew the property manager had asked the Stockton Police Department to expel people who were gathering in the parking lot and on the sidewalk outside the liquor store and laundromat. They had received many calls for service asking them to do just that. They knew people often dispersed into the nearby businesses, including the laundromat. They knew Brye had been arrested and forced to leave the day before, and they knew he was not welcome. They warned him not to return. They had heard him say he would come back the next day, and he did just that. Then they saw him in the common area again the very next day.

It does not matter whether the officers had section 602(k) specifically in mind when they arrested Brye, nor that an astute attorney might later conclude that a conviction under that section would be difficult to obtain, nor that Brye was never charged with or convicted of trespassing. *See Blankenhorn*, 485 F.3d at 473, 474. Probable cause is a question of what was reasonable to conclude from the circumstances the officers faced and the information they had at the time of the arrest, not of what statutory provision the officers had in mind, and not whether their suspicions ultimately were borne out in charges and a conviction. *See Edgerly*, 599 F.3d at 954.

Brye argues the officers could not have had probable cause because he never received a written notice from the property owner, or service of a judicial restraining order. *See, e.g.*, Opp'n 3, 6–7. He cites no law, however, that makes a written notice or a restraining order an element of an offense under section 602(k), he could identify no authority in response to the court's questions at hearing, and he does not dispute that the property manager intended to bar him and others from spending time in the common area outside West Lane Plaza. The court's own searches have yielded no case or statute imposing such a requirement. To the contrary, a verbal

13

or oral statement has sufficed in the past. *See, e.g.*, *Ball*, 23 Cal. App. 3d at 385 (describing oral refusal by phone).

Brye argues similarly that the laundromat's owner never asked him to leave the laundromat in particular. *See* Opp'n at 9. It is undisputed, however, that Brye had parked his car in the common parking lot and that the officers saw him on the shared sidewalk when they arrived. Nor does Brye dispute Sahota's testimony that Brye often spent time in the common areas at West Lane Plaza with a group of people who used and sold drugs and harassed Sahota and his customers—a group that often fled into the laundromat to avoid the officers who came to expel them from the common areas at West Lane Plaza, then returned to where they had been.

Brye cites no case in which any court has held that officers lacked probable cause in a similar situation. The court's own searches has returned cases that undermine his position. California federal district courts have often found officers had probable cause to believe they had witnessed a criminal trespass in similar circumstances. *See, e.g.*, *Conta v. City of Huntington Beach*, No. 21-01897, 2022 WL 18278391, at *3–4 & n.2 (C.D. Cal. Dec. 5, 2022) (citing Cal. Pen. Code §§ 602(m), (o), (s) & (t)(1)); *Daniels v. G4S Secure Sols. USA Inc.*, No. 20-283, 2021 WL 4202521, at *4 (C.D. Cal. Aug. 12, 2021) (citing Cal. Pen Code §§ 602(m) & (o)); *Close v. City of Vacaville*, No. 17-01313, 2019 WL 859581, at *5 (E.D. Cal. Feb. 22, 2019) (citing Cal. Pen. Code § 602(o)), *aff'd in relevant part*, 846 F. App'x 513 (9th Cir. 2021) (unpublished); *Eberhard v. Cal. Hwy. Patrol*, No. 14-01910, 2015 WL 6871750, *4–5 (N.D. Cal. Nov. 9, 2015) (citing Cal. Pen. Code §§ 602(k), (l) & (o)). For that reason, the officers here would be entitled to qualified immunity even if there were no probable cause. *See Eberhard*, 2015 WL 6871750, at *5 (granting summary judgment based on qualified immunity in similar case of suspected trespass). The court therefore grants the officers' motion for summary judgment of claim two.

### C. Claim 3: Unlawful Search and Seizure

In Brye's third claim, he alleges the officers unlawfully searched his car in violation of the Fourth Amendment. The Fourth Amendment prohibits "unreasonable searches." "[R]easonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). "In the absence of a warrant, a search is reasonable only

if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). The parties discuss a number of these exceptions in their briefing, but do not always apply them distinctly and methodically, so the court begins by summarizing those exceptions and their respective limits.

First, an exception known as the "automobile exception" allows police officers to search a car even if there has been no lawful arrest in certain limited situations. *See Collins v. Virginia*, 584 U.S. 586, 591–92 (2018). In the Supreme Court's decisions about what the Fourth Amendment forbids, it has written that "the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible." *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976). In addition, "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Id.* "When these justifications for the automobile exception 'come into play,' officers may search an automobile without having obtained a warrant so long as they have probable cause to do so." *Collins*, 584 U.S. at 592 (quoting *California v. Carney*, 471 U.S. 386, 392–93 (1985)). And "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999) (emphasis omitted) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

A different exception to the warrant requirement allows police officers to conduct warrantless searches incident to lawful arrests. *See Arizona v. Gant*, 556 U.S. 332, 335 (2009). The search must be limited to "the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'" *Id.* (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). A search under this exception may include a search of a vehicle's passenger compartment if "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* at 343. In addition, "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J.,

15

concurring in the judgment)). "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Id.* "But in others . . . the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Id.*

Next, "[i]t is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Arizona v. Hicks*, 480 U.S. 321, 326 (1987) (emphasis omitted) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)). Searches, too, may be permissible when the object to be searched is in the officer's plain view. *See id.* at 327–28. But this "plain view" rule cannot "extend a general exploratory search from one object to another until something incriminating at last emerges." *Id.* (quoting *Coolidge*, 403 U.S. at 466). The Supreme Court thus has imposed limits on warrantless plain-view searches and seizures. The officers must of course have arrived "at the place from which the evidence could be plainly viewed" without violating the Fourth Amendment, and they must have had a "lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136, 137 (1990). Nor may officers seize whatever objects they might see during an otherwise constitutional search. The "incriminating character" of the seized item must be "'immediately apparent.'" *Id.* (quoting *Cooledge*, 403 U.S. at 466). Probable cause may also be necessary before officers can search an object within their plain view. In *Hicks*, for example, the Supreme Court held that officers could check an expensive stereo system for its serial number only if they had "probable cause to believe the equipment was stolen," even though the equipment was in plain view, and even though the officers were lawfully inside the apartment where they saw it. 480 U.S. at 328.

This plain view exception can sometimes be easy to confuse with the more basic rule that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection" in the first place. *California v. Ciraolo*, 476 U.S. 207, 213 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). The Supreme Court has held, for example, that police need no warrant to look through the garbage a person has left for collection in a public place, *see California v. Greenwood*, 486 U.S. 35, 41–42 (1988); to look down upon a marijuana grow or a chemical plant from an airplane flying overhead, *see Ciraolo*,

16

1    478 U.S. at 215; *Dow Chem. Co. v. United States*, 476 U.S. 227, 238–39 (1986); or to watch a
2    plume of smoke as it rises from a smokestack into the sky, *see Air Pollution Variance Bd. of*
3    *Colo. v. W. Alfalfa Corp.*, 416 U.S. 861, 864–65 (1974). In these cases, the Court has "applied
4    somewhat in reverse the principle first enunciated in *Katz v. United States*," i.e., "that a Fourth
5    Amendment search does *not* occur—even when the explicitly protected location of a *house* is
6    concerned—unless 'the individual manifested a subjective expectation of privacy in the object of
7    the challenged search,' and 'society is willing to recognize that expectation as reasonable.'"
8    *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (emphases in original) (alterations omitted)
9    (quoting *Ciraolo*, 476 U.S. at 211 and citing *Katz*, 389 U.S. at 347).

10   Returning to Brye's car and the defendants' decision to search it, there is no dispute but
11   that the officers conducted a "search" in the words of the Fourth Amendment. No one contends
12   the seized evidence—the jars of marijuana, the scale, or the baggies the officers found—were out
13   in the open, plain for all to see. And because all agree the officers had no warrant, the search was
14   not "reasonable" unless they identify an applicable exception to the warrant requirement.

15   The automobile exception is the most plausibly applicable of those the officers raise. As
16   summarized above, that exception permits officers to "search an automobile without having
17   obtained a warrant so long as they have probable cause to do so." *Collins*, 584 U.S. at 592
18   (quoting *Carney*, 471 U.S. at 390). An officer has probable cause to search a car under this
19   exception "when, based on the totality of the circumstances, there is 'a fair probability that
20   contraband or evidence of a crime will be found.'" *United States v. Williams*, 846 F.3d 303, 312
21   (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

22   In *Williams*, for example, the case defendants rely on in their motion, the officers had
23   learned from their dispatcher that a man "was sleeping in his car in an unauthorized location" and
24   that he "was known to deal drugs in the area." *Id.* It was early in the morning when the officers
25   approached the vehicle, and it was "a high-crime neighborhood." *Id.* The man "popped up"
26   when the officers came near, then ran. *Id.* They chased and caught him, then arrested him for
27   refusing to identify himself, as Nevada law required him to do. *See id.* at 311–12. They searched
28   him incident to the arrest, s*ee id.* at 312, and found small packages of cocaine, each individually

17

1   wrapped, along with more than $1,000 in small bills, *see id.* at 312–13. These circumstances
2   made for a fair probability the officers would find more "contraband or other evidence of drug
3   dealing" in the car from which he had just fled, so the officers could search it without first
4   obtaining a warrant. *Id.* at 313.

5         The defendant officers in this case argue they, too, had probable cause to believe they
6   would find evidence of drug dealing in Brye's car, but they cite much less evidence than the
7   officers in *Williams* had. *See* Mem. at 15. They point to three facts. First, a caller had reported
8   people were gathered around a car and intended to buy or sell drugs there. *See* Brown Decl. at 1.
9   But the officers do not say who made this report, how many people the person saw, who those
10  people were, what they looked like, what car they were gathered around, how the person knew
11  what the people intended, or what the drugs were involved. Second, the officers point out that
12  when Brown arrived, he saw Brye walking away from the parking lot toward the laundromat. *Id.*
13  But Brown does not say whether Brye appeared to be walking away from his car or any car, nor
14  whether Brye was with anyone or was doing anything that might suggest he was buying or selling
15  drugs. Third, the officers cite the "crumbs" of unburned marijuana on the center console of
16  Brye's car. *See* Brye Decl. ¶ 21. But unlike the officers in *Williams*, the officers in this case do
17  not claim they found drugs or any evidence related to drug trafficking when they searched Brye's
18  pockets. They do not claim they saw the jars or scale or baggies before they searched the car.
19  They cite no case in which similarly sparse evidence sufficed to give officers probable cause. To
20  the contrary, Brye's possession of marijuana was legal under California law and defendants
21  cannot rely on his possession as indicative of drug dealing sufficient to support their warrantless
22  search, at least not as a matter of California state law. *See* Opp'n at 12–13; *United States v.*
23  *Stuckey*, No. 22-153, 2023 WL 3931832, at *4 (E.D. Cal. June 9, 2023).

24        The defendant officers provide little clarity or legal authority showing any other exception
25  could have permitted their warrantless search. The officers cannot rely on the exception for
26  searches incident to arrests. Brye was not near his car when he was arrested. He could not have
27  reached it from where the officers were pinning him on the ground. Nor have the officers given
28  any reason to believe they were likely to find evidence related to trespassing, the crime of arrest,

within Brye's car. The exception for objects in plain view is similarly unhelpful to the officers' defense. They do not contend they had a right to search or seize the car just because it was in "plain view," and they could only have done so if it had some immediately apparent and incriminating character, or if there was probable cause for a search. *See Hicks*, 480 U.S. at 328. The officers did see "crumbs" of unburned marijuana from outside the car, of course, but there is no allegation here that they searched or seized those crumbs unlawfully. Nor were the objects they seized—the jars, the scale, the baggies—in plain view. Nor do the officers discuss any of the other requirements of the plain view exception, i.e., that they saw the objects from a place they reached lawfully, that they had a right to access those objects, and that their incriminating character was apparent.

The officers also assert their qualified immunity to this claim. *See* Mem. at 18–19; Reply at 6–7. Brye correctly notes that California appellate courts have decided "the lawful possession of marijuana in a vehicle does not provide probable cause to search the vehicle." *People v. Hall*, 57 Cal. App. 5th 946, 948 (2020) (collecting authority); *see also Struckey*, 2023 WL 3931832, at *4 (citing *Hall* and similar California cases). He does not, however, acknowledge that this state law may actually be "irrelevant to the Fourth Amendment inquiry." *United States v. Steinman*, 130 F.4th 693, 714 & n.10 (9th Cir. 2025); *see also Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("[S]tate restrictions do not alter the Fourth Amendment's protections."). Of note, the Ninth Circuit recently held that evidence of federal crimes, such as violations of the federal Controlled Substance Act, may "be seized by state officers if that evidence is in plain view." *Steinman*, 130 F.4th at 714.

In any event, however, Brye cites no federal decisions in any similar cases that clearly established the Fourth Amendment prohibited the officers from searching his car. The law instead appears to have been changing and uncertain at the time of the search, i.e., in February 2021. *Compare, e.g.*, *United States v. Malik*, 963 F.3d 1014, 1015–16 & n.1 (9th Cir. 2020) (per curiam) (finding officers had probable cause to search a truck after driver admitted to smoking marijuana several hours before, even though state law did not criminally punish possession; declining to decide whether officers had probable cause based on federal law) *and United States*

19

*v. Gray*, 772 F. App'x 565, 566–67 & n.2 (9th Cir. 2019) (unpublished) (rejecting arguments based on state law permitting possession of small amounts of marijuana and declining to decide whether officers had probable cause based on federal law) *with, e.g.*, *United States v. Martinez*, 811 F. App'x 396, 397 (9th Cir. 2020) (unpublished) (vacating denial of motion to suppress based on cases decided before California voters adopted Proposition 64, "which legalized the possession of 28.5 grams or less of marijuana" and declining to consider whether officers had probable cause to suspect federal crime) *and United States v. Talley*, 467 F. Supp. 3d 832, 835–37 (N.D. Cal. 2020) (discussing conflicting cases and finding officers lacked probable cause). This conflicting precedent is not "clear enough that every reasonable official would interpret it to establish" the officers in this case had no probable cause to search Brye's car. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

In sum, although genuine disputes of fact leave open the possibility that Brye could prove at trial the search was unconstitutional, the officers are entitled to qualified immunity because the relevant law was unclear at the time and did not put them on notice. For the same reason, Thurlow therefore cannot be liable for any failure to supervise the other officers. The court grants the motion for summary judgment of claim three in total.

III. **CONCLUSION**

For the reasons above, the claims for fabrication of evidence, the claim against Thurlow for failure to supervise in connection with the allegedly unlawful arrest, and all claims against the City of Stockton are **dismissed as withdrawn.** The motion for summary judgment (ECF No. 51) is otherwise **granted**, and the clerk's office is instructed to close the case.

IT IS SO ORDERED.

DATED: November 4, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE